UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRENT McKINNEY,

                Petitioner,

Criminal Case Number 13-20182
Civil Case Number 15-11153
Honorable David M. Lawson

UNITED STATES OF AMERICA,

                Respondent.

_____/

## OPINION AND ORDER DENYING MOTION TO VACATE SENTENCE MOTION TO REDUCE SENTENCE, AND MOTION TO CORRECT SENTENCE

Petitioner Brent McKinney was convicted by a jury after a four-day trial of several crimes stemming from his operation of a home-made methamphetamine laboratory in the basement of a home where a minor child lived. After trial, he renewed and fully briefed his mid-trial motion for judgment of acquittal, which was denied. He did not directly appeal his convictions or sentences.

About a year later, McKinney filed the present motion to vacate his sentence under 28 U.S.C. § 2255 and motion to reduce his sentence under 18 U.S.C. § 3583(c). The Court appointed counsel for him under the Criminal Justice Act (CJA). In his section 2255 motion, McKinney alleged that his trial attorney was ineffective by failing to file any motion to suppress certain physical evidence that was seized by police during a warrantless search of the defendant's bedroom, and he asked for an evidentiary hearing and a new trial. Sometime later, McKinney apparently reached an impasse with his CJA-appointed attorney and asked that he be discharged. The Court obliged. McKinney then supplemented his motion with additional allegations of ineffective assistance of trial counsel, and raised another sentencing issue, this one based on a challenge to a sentencing guideline provision addressed in *Johnson v. United States*, --- U.S. ---, 135 S. Ct. 2551 (2015). The government has responded to the section 2255 motion and supplements.

An evidentiary hearing is not necessary to resolve the issues raised in any of the motions, and McKinney is not entitled to relief. The motion to vacate sentence (and its supplements) and the motion to reduce sentence will be denied.

I.

A grand jury charged McKinney with conspiracy to manufacture methamphetamine (Count 1); conspiracy to manufacture methamphetamine on a premises where a child is present (Count 2); maintaining a drug-involved premises (Count 3); endangering life while manufacturing methamphetamine (Count 4); unlawful possession of material or equipment used to manufacture methamphetamine (Count 5); and possessing a firearm during and in relation to a drug trafficking crime (Count 6). The trial jury acquitted him of the firearm charged and found him guilty of all the others.

The investigation began with a tip and a search.

City of Port Huron Police Officer Nicholas Godwin testified at trial about the search of the home where McKinney then lived with his co-defendants Robert Folliard and Amber King, who also testified at trial. On January 17, 2013, Godwin was working with the St. Clair County Drug Task Force, when a Port Huron police officer informed him about a call that had been received involving the welfare of a young girl. The officer reported to Godwin that Brent McKinney reportedly was cooking methamphetamine in a home at 2611 Gratiot, where McKinney lived with two other adults and a child. Godwin consulted his supervisor, who directed him to go to the residence and investigate the tip. Officers arrived at the home around 10:30 p.m. Godwin knocked on the door, and it was answered by Folliard. Godwin stated that police were there to check on the welfare of a young child and investigate the report that methamphetamine was being made in the house.

Folliard stated that the child was upstairs in the house asleep, and his girlfriend, Ms. King, was upstairs in the shower. He told police that there was no methamphetamine manufacturing going on in the home. Folliard also told police that McKinney lived downstairs, in the basement, but that McKinney was not at home.

Folliard let the officers into the house and told them they could look around the house if they wanted to. Officers went upstairs and observed a young girl sleeping in a bedroom. They then went back downstairs and spoke to Folliard again about McKinney and the report of methamphetamine manufacturing.

After speaking with Folliard, the officers searched the main floor of the home and then went to the kitchen, where stairs led to the basement. As they went downstairs, Folliard warned the police that McKinney kept a pit bull in his room. Folliard followed the officers downstairs and then went into McKinney's bedroom to secure the dog. While they were standing in the common area of the basement, officers observed a 20-ounce soda bottle sitting near a laundry tote, with plastic tubing sealed to the top and leading outside. Godwin recognized the bottle apparatus as a "gas generator" commonly used for producing methamphetamine. After Folliard removed the dog from the bedroom and took it outside, police entered the room to see if McKinney was there, but he was not. While they were in the bedroom, officers saw in plain sight "a coffee grinder, cold packs, [what] appeared to be used coffee filters and some two-liter bottles that appeared to be old reaction vessels from the methamphetamine cooks." Some of the items recovered subsequently were admitted as physical evidence at trial.

Other witnesses testified that McKinney resided in a bedroom located in the basement of a house in Port Huron, Michigan owned by Folliard and King. Folliard and King lived on the first and

second floors of that house with Folliard's six-year-old daughter. They had been charged as co-defendants with McKinney, but they pleaded guilty and testified against McKinney at trial. Together with other witnesses — also former co-defendants — they testified that they purchased pseudoephedrine at McKinney's request and furnished it to him as an ingredient for the methamphetamine he manufactured in the basement of Folliard's home. Those cooperating witnesses also described the leniency agreements they made with the government and were subject to cross-examination about them.

McKinney made a mid-trial motion for judgment of acquittal, which the Court took under advisement. The jury returned its verdict, and on March 12, 2014, the Court denied the defendant's mid-trial motion for a judgment of acquittal in a published opinion. *United States v. McKinney*, 3 F. Supp. 3d 664 (E.D. Mich. 2014).

The sentencing hearing was held on March 13, 2014. In calculating the sentencing guideline range, the Court found that the base offense level was 16, which corresponded to responsibility for between 5 and 10 grams of methamphetamine, based on the 8.8 grams recovered and verified by police. *See* U.S.S.G. § 2D1.1(c)(12) (2013). The Court rejected the government's argument for assessment of a higher drug quantity and the probation department's recommendation for a two-level enhancement based on involvement of a firearm under § 2D1.1(b)(1). The Court then applied a "child endangerment" enhancement under guideline section 2D1.1(b)(13)(D), which requires either a six-level increase in the offense level or, if the resulting level is less than 30, an increase in the total offense level to 30. The Court rejected a recommendation of a four-level enhancement based on playing a "leadership role" in a drug conspiracy, leaving the defendant with a net offense level of 30. Combined with a criminal history category of V, the resulting guideline range was 151 to 188

months. The Court granted the defendant's request for a downward variance based on its consideration of his troubled family history and sentenced McKinney to a below-guidelines sentence of 100 months on Counts 1, 3, 4, and 5 of the indictment, to run concurrently, and 20 months on Count 2 to run consecutive to the sentence on Counts 1, 3, 4, and 5.

McKinney filed his motion to reduce sentence on November 18, 2014 and his 2255 petition on March 25, 2015. He did not pursue any direct appeal of his conviction or his sentence.

## II. 2255 Motion

A federal prisoner challenging his sentence under section 2255 must show that the sentence "was imposed in violation of the Constitution or laws of the United States," the sentencing court lacked jurisdiction, the sentence exceeds the maximum penalty allowed by law, or it "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "A prisoner seeking relief under 28 U.S.C. § 2255 must allege either: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)).

A claim that could have been raised on direct appeal generally is not reviewable in a section 2255 motion. *Bousley v. United States*, 523 U.S. 614, 621 (1998). However, a claim that "cannot otherwise be reviewed for the first time on a § 2255 motion can be reviewed as part of a successful claim that counsel provided ineffective assistance." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001). Claims of ineffective assistance of counsel are properly raised in a section 2255 motion. *United States v. Graham*, 484 F.3d 413, 421-22 (6th Cir. 2007) (quoting *United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997)).

A. Ineffective Assistance of Counsel

McKinney contends that his trial attorney failed to deliver constitutionally sound representation. To succeed on an ineffective assistance of counsel claim, the petitioner "must show both deficient performance and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009).

The instances of deficient performance McKinney cites in his initial 2255 motion and the supplements are: not challenging the warrantless search of his bedroom and seizure of evidence that was offered at trial; failing to file a direct appeal; failing to pursue a pretrial ruling on the multiplicity of certain counts of the indictment; failing to challenge the constitutionality of 21 U.S.C. § 860a (relating to the child endangerment count); and not allowing him to testify in his own defense.

An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). One way of establishing defective performance is to show that defense counsel missed a meritorious argument under the controlling law. However, the failure to file a meritless motion or raise a groundless objection does not constitute defective performance. *Jalowiec v. Bradshaw*, 657 F.3d 293, 321-22 (6th Cir. 2011) (stating that an "attorney is not required to raise a non-meritorious claim" (citing *Wilson v. Mitchell*, 498 F.3d 491, 514-15 (6th Cir. 2007))); *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (reiterating that the "[Supreme] Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success" to avoid a finding of deficient performance under *Strickland*).

1. Search and Seizure

The Fourth Amendment arguments fail under this latter rubric. McKinney argues that his trial attorney was ineffective because he never filed a motion to suppress the evidence allegedly unlawfully discovered during the warrantless search of his bedroom, and that he had a reasonable expectation of privacy in that padlocked private basement bedroom, which could not be overcome by Folliard's consent to the search of other areas of the home. Certainly, McKinney enjoyed the right to be free from "'unreasonable searches and seizures,'" *Florida v. Jardines*, --- U.S. ---, ---, 133 S. Ct. 1409, 1414 (2013), and the search of his bedroom amounted to "a search within the original meaning of the Fourth Amendment." *Ibid.* (internal quotation marks omitted) (quoting *United States v. Jones*, --- U.S. ---, ---, n.3, 132 S. Ct. 945, 950-51, n.3 (2012)). The government concedes these points, and it does not rely on Folliard's consent to justify the warrantless entry. But here, the warrantless entry was justified because (1) there were multiple outstanding warrants for McKinney's arrest and the police had reason to believe McKinney might be found in his bedroom, and (2) the risk that the methamphetamine-making operation posed to the safety of other residents of the house, including a minor child, justified the entry to the bedroom in order to assess and address that serious risk.

McKinney does not dispute that there were multiple outstanding warrants for his arrest at the time of the search, including a felony warrant relating to other drug charges. "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980). Officers had reason to believe McKinney was in his private bedroom, because Folliard had told them moments before that

McKinney lived there. Folliard also asserted that McKinney was not at home, but, as the government points out, the police had sound reasons to doubt that denial. Folliard also told police that no methamphetamine manufacturing was going on in the home, but police observed what they recognized as a reaction vessel used in making the drug in plain sight in the basement common area. The police therefore were reasonably justified in concluding that, if Folliard was lying or mistaken about the meth-making activity they had just seen clear evidence of, he also might be lying or mistaken about whether McKinney was home at the time.

McKinney does not challenge the consented search of the home and the basement common area generally; his main dispute arises at the point where police arrived outside his bedroom door. But the entry to the bedroom was justified in order to assess and address what the police reasonably perceived to be a serious and imminent risk of harm to third parties — in particular the young child they had just minutes earlier seen sleeping in an upstairs bedroom. Of course, "[f]or exigent circumstances to excuse a warrantless search or seizure, there must be both 'compelling need for official action and no time to secure a warrant.'" *Carlson v. Fewins*, 801 F.3d 668, 674 (6th Cir. 2015) (quoting *Missouri v. McNeely*, 133 S. Ct. 1552, 1559 (2013)). But "[e]xigent circumstances are present as a matter of law . . . to prevent imminent harm to police or third parties." *United States v. Washington*, 573 F.3d 279, 286-87 (6th Cir. 2009) (citing *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996)).

As the Court previously noted in its opinion denying the defendant's motion for judgment of acquittal, "the trial testimony adequately established that a real and substantial risk of harm to human life was created during McKinney's manufacturing activities, as a result of the use of inherently dangerous toxic, corrosive, and volatile chemicals, several of which can cause fires or

burn the skin and mucous tissues if contacted or inhaled." *McKinney*, 3 F. Supp. 3d at 673; *see also United States v. Layne*, 324 F.3d 464, 469 (6th Cir. 2003) (concluding that "the methamphetamine laboratory . . . posed a substantial risk of harm to human life" due to "the highly explosive and toxic materials involved" and the proximity of the lab to other residences and a nearby school). The police already had observed plain evidence of ongoing methamphetamine making in the form of the reaction vessel in the basement common area, and that observation corroborated the tip that led them to the home, where their arrival had first been precipitated by concerns about the welfare of a young child who they had been told could be — and who actually was — exposed to serious risks due to the hazardous activity being carried out in her home.

The entry to the bedroom was lawful due to the outstanding arrest warrants and exigent circumstances that the police observed during the consented search of other areas of the home, and, once they properly had gained entry to the bedroom, the officers fully were justified in seizing the items of obvious contraband that they observed in plain sight within. A pretrial suppression motion would not have been successful, and trial counsel cannot be faulted for not filing one. Moreover, an attorney's deficient performance is prejudicial only if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The likely outcome of a suppression motion if it had been filed would not have impacted the trial evidence.

2. Failing to File a Direct Appeal

At sentencing, McKinney was informed on the record of his appellate rights, but he says he did not pursue them because he got bad advice from his lawyer: that appealing would result in a

longer sentence. But that conversation apparently occurred *after* the Court pronounced the sentence. If there was any apparent danger of an imagined sentence enhancement, it had passed by then.

The decision to appeal certainly was McKinney's, and he acknowledges that his lawyer consulted with him about that. The Supreme Court has held that prejudice can be presumed only if counsel failed to consult with the defendant about an appeal. *Roe v. Flores Ortega*, 528 U.S. 470, 479 (2000). And the Sixth Circuit has held that in the absence of an explicit instruction to do so, counsel is not obliged to file a notice of appeal. *Regalado v. United States*, 334 F.3d 520, 525 (6th Cir. 2003). There is no suggestion in any of the motion papers or the record as a whole that trial counsel disregarded any such instructions.

Moreover, McKinney has not shown that there is any non-frivolous issue that he might have won on appeal, as he must. *Smith v. Robbins*, 528 U.S. 259, 288 (2000). The potential issues likely would have been those raised in the motion for judgment of acquittal, which were raised mid-trial and then expounded in trial counsel's post-judgment motion, which was fully briefed. Those issues included the multiplicity argument, the constitutionality of 21 U.S.C. § 860a, and the sufficiency of evidence. In light of the Court's ruling, advice about the unlikelihood of success on appeal cannot be found deficient.

### 3. Failing to Raise Multiplicity Issue Before Trial

Similarly, the multiplicity issue, although not raised before trial, was fully argued, briefed, and adjudicated. McKinney contends that the timing of that motion put him at a disadvantage, but it is not apparent how. The question was whether the count charging conspiracy to manufacture methamphetamine and the count charging conspiracy to manufacture methamphetamine with a child present actually charged the same crime twice. Success on that issue would have been realized had

McKinney prevailed on the motion midtrial, post-trial, or at sentencing. McKinney cannot demonstrate prejudice based on the timing of when the issue was raised.

### 4. Failing to Challenge Constitutionality of 21 U.S.C. § 860a

The same can be said of the constitutional challenge to his conviction under 21 U.S.C. § 860a. That issue in fact was addressed in the motion for judgment of acquittal by trial counsel. The Court found against the defendant, concluding that the Congress intended to create a separate crime, and not simply a sentence enhancement. *McKinney*, 3 F. Supp. 3d 668-71.

### 5. Not Allowing Defendant to Testify

The Sixth Circuit has held that a defendant waives an ineffective assistance of counsel claim based on not testifying at trial, unless the defendant alerts the trial judge of his desire to testify. *Gonzales v. Elo*, 233 F.3d 348, 356-57 (6th Cir. 2000) (quoting *United States v. Webber*, 208 F.3d 545, 556-57 (6th Cir. 2000)). The record shows that McKinney had ample opportunity to do so. At the close of the government's proofs, the Court advised McKinney of his options. And the Court emphasized that "the decision about whether to testify is not mine, and it's not Mr. Donini's [defense counsel] or Ms. Praad's [the AUSA], it's yours and yours alone." Trial Tr. (vol. 3) at 194 (Dec. 5, 2013). Elaborating, the Court stated, "Of course, I would expect that you would consult with your lawyer and receive that advice, but after considering that advice, you have to make the decision." *Id.* at 95. After electing not to testify, McKinney cannot complain about it here.

### 6. Evidentiary Hearing

McKinney contends that he is entitled to a hearing on his ineffective assistance of counsel claims. The Court disagrees. As the Sixth Circuit explained, no hearing is required when "'the motion and the files and records of the case conclusively show that the prisoner is entitled to no

relief.'" *Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003) (quoting *Fontaine v. United States*, 411 U.S. 213, 215 (1973)); *see also Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996) (holding that "evidentiary hearings are not required when . . . the record conclusively shows that the petitioner is entitled to no relief."); *Huff v. United States*, 734 F.3d 600, 607 (6th Cir. 2013). Moreover, "when the trial judge also hears the collateral proceedings . . . that judge may rely on his recollections of the trial in ruling on the collateral attack." *Blanton*, 94 F.3d at 235 (citing *Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1977)).

There is no need to hold a hearing to determine the issues discussed above. The present record provides a sufficient basis to adjudicate the search and seizure issue, and the complaints about the timing of the legal challenges to the indictment. There is no fact dispute that underlies the contention that McKinney's attorney did not file a notice of appeal, since no prejudice can be shown even if McKinney could demonstrate defective performance (which he has not). And the contention that McKinney was prevented from testifying at trial is belied by the trial record itself.

And McKinney has not offered any affidavits in support of those claims or even any description in his motion or supplement that suggests a factual dispute that requires an evidentiary hearing. In the absence of even a hint of what facts could be presented to the Court in support of his claims, they may be decided without resort to an evidentiary presentation. *See Clark v. Waller*, 490 F.3d 551, 557-58 (6th Cir. 2007).

B. Constitutionality of U.S.S.G. § 2D1.1(b)(13)(D)

In his supplemental brief, McKinney mounts a challenge to a section of the drug crime section in the Sentencing Guideline Manual that increases a base offense level for child endangerment. The enhancement applies if the crime involved manufacturing methamphetamine,

and the activity "created a substantial risk of harm to the life of a minor." U.S.S.G. § 2D1.1(b)(13)(D). McKinney seizes on the "substantial risk of harm" language, and because that terminology mirrors language in the Armed Career Criminal Act (ACCA) found unconstitutionally vague by *Johnson v. United States*, --- U.S. ---, 135 S. Ct. 2551 (2015), he insists that he should be resentenced based on a guideline range calculated without the enhancement.

The argument must fail. The Supreme Court held recently that the *advisory* sentencing guidelines are not subject to the vagueness challenge identified in *Johnson*, because, unlike the ACCA, "the advisory Guidelines do not fix the permissible range of sentences." *Beckles v. United States*, --- U.S. ---, 137 S. Ct. 886, 892, 897 (2017). For that reason, the Sixth Circuit has concluded that "the Guidelines' residual clause remains valid even after *Johnson*." *United States v. Smith*, --- F.3d ---, No. 16-6720, Slip Op. at 2 (6th Cir. Feb. 7, 2018).

McKinney's Sentencing Guideline range was calculated properly. Moreover, the non-binding nature of the Sentencing Guidelines is apparent in this case, where McKinney benefitted from a substantial variance from the applicable range of 151 to 188 months. He is not entitled to relief on this issue.

### III. Section 3583(c) Motion

McKinney also moved to reduce his sentence under 18 U.S.C. § 3583(c), arguing that he should benefit from Sentencing Guideline Amendment 782, which retroactively reduced the base offense level of many drug crimes. He contends that the base offense level for his offense of conviction has been retroactively reduced by two, which would give him a total offense level of 28, rather than the 30 that was applied at sentencing, leading to a lower guideline range of 130 to 162 months. He asks that the Court afford him the same downward variance that it granted at his

original sentencing and resentence him to a term at least as far below the bottom end of the new guidelines range as his original sentence was below the bottom end of the original range.

Under 18 U.S.C. § 3582(c), a court may modify a term of imprisonment after it is imposed only under certain conditions. "[I]n the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant . . ., the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(2).

"The Department of Justice's 'Drugs Minus Two' sentencing policy [was] adopted under then-Attorney General Eric Holder and codified in the Guidelines through Amendment 782, effective November 1, 2014," and "[p]ursuant to that policy, the base offense level of many, but not all, drug crimes was retroactively reduced by two." *United States v. Powell*, 798 F.3d 431, 442 (6th Cir. 2015) (citations omitted). "The effective date of this amendment is November 1, 2014," but "offenders cannot be released from custody pursuant to retroactive application of Amendment 782 before November 1, 2015." Sentencing Guidelines for the United States Courts, Am. 782 to Policy Stmt. § 1B1.10, 79 Fed. Reg. 44973-01 (Aug. 1, 2014).

However, McKinney is not entitled to resentencing based on the drug quantity table revisions of Amendment 782, because the total offense level of 30 that applied to his guidelines was driven by the "child endangering" enhancement under section 2D1.1(b)(13)(D). An alteration of the starting base offense level for the offense of conviction would not change the resulting total offense level that must be assessed based on the circumstances of the crime.

When calculating McKinney's sentencing guideline range, the Court found that the defendant was accountable for "between five and ten grams of methamphetamine," which, under the then-effective Drug Quantity Table codified in Sentencing Guidelines Section 2D1.1(c)(12) resulted in a base offense level of 16. Under the current version of the Drug Quantity Table, as altered by Amendment 782, the corresponding base offense level would be 14, which is two levels less than the previously calculated base offense level. U.S.S.G. 2D1.1(c)(13).

However, Amendment 782 did not alter guideline section 2D1.1(b)(13)(D), which, as noted earlier, requires that "[i]f the offense (i) involved the manufacture of amphetamine or methamphetamine; and (ii) created a substantial risk of harm to the life of a minor or an incompetent, [then the Court must] increase [the offense level] by 6 levels," and "[i]f the resulting offense level is less than level 30, increase to level 30." Section 2D1.1(b)(13) — which was not changed by Amendment 782 — therefore would require the Court to add 6 levels to the current base level of 14, and, because the result (20) would be less than 30, to increase the offense level to 30. That was the same result reached at the original sentencing, based on the same subsection. McKinney's offense level was controlled by the child-endangering provision in section 2D1.1(b)(13)(D), not the drug quantity table base offense level, and he was not "sentenced to a term of imprisonment *based on a sentencing range that has subsequently been lowered* by the Sentencing Commission." 18 U.S.C. § 3582(c)(2) (emphasis added). He therefore is not entitled to have his sentence reduced. *See United States v. Powell*, 798 F.3d 431, 442 (6th Cir. 2015) ("Powell would have been eligible for this two-level reduction but for his career-offender status."); *see also United States v. Steel*, 609 F. App'x 851, 856 (6th Cir. 2015) ("[T]he § 4B1.1(b)(3) career-offender offense

level controls because it is greater than the drug-quantity offense level under Guideline Amendment 782.").

## IV. Motion to Correct Sentence

McKinney filed a motion styled as a motion to correct his sentence, in which he challenges another aspect of his guideline range calculation. He contends that his criminal history category was not determined properly, and the "correct" calculation would result in a lower range.

This motion was not filed until September 2017. Nonetheless, because McKinney's initial section 2255 motion was still pending at the time, the Court will consider the late filing.

However, this issue was well-known to the defendant at the time of sentencing. He did not raise it then, and he did not file a direct appeal. A 2255 motion is not a portal for second chances. *Bousley*, 523 U.S. at 621 (holding that "even the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review"); *Regalado*, 334 F.3d at 528 (reaffirming that "[s]ection 2255 is not a substitute for a direct appeal, and thus a defendant cannot use it to circumvent the direct appeal process"). In *United States v. Frady*, 456 U.S. 152 (1982), the Supreme Court observed:

> Once the defendant's chance to appeal has been waived or exhausted, however, we are entitled to presume he stands fairly and finally convicted, especially when, as here, he already has had a fair opportunity to present his federal claims in a federal forum. Our trial and appellate procedures are not so unreliable that we may not afford their completed operation any binding effect beyond the next in a series of endless postconviction collateral attacks. To the contrary, a final judgment commands respect. For this reason, we have long and consistently affirmed that a collateral challenge may not do service for an appeal.

*Frady*, 456 U.S. at 164-65; *accord Elzy v. United States*, 205 F.3d 882, 884 (6th Cir. 2000) (stating that "respect for the finality of judgments demands that collateral attack generally not be allowed to do service for an appeal"). Where a defendant fails to assert claims on direct appeal and attempts

level controls because it is greater than the drug-quantity offense level under Guideline Amendment 782.").

## IV. Motion to Correct Sentence

McKinney filed a motion styled as a motion to correct his sentence, in which he challenges another aspect of his guideline range calculation. He contends that his criminal history category was not determined properly, and the "correct" calculation would result in a lower range.

This motion was not filed until September 2017. Nonetheless, because McKinney's initial section 2255 motion was still pending at the time, the Court will consider the late filing.

However, this issue was well-known to the defendant at the time of sentencing. He did not raise it then, and he did not file a direct appeal. A 2255 motion is not a portal for second chances. *Bousley*, 523 U.S. at 621 (holding that "even the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review"); *Regalado*, 334 F.3d at 528 (reaffirming that "[s]ection 2255 is not a substitute for a direct appeal, and thus a defendant cannot use it to circumvent the direct appeal process"). In *United States v. Frady*, 456 U.S. 152 (1982), the Supreme Court observed:

> Once the defendant's chance to appeal has been waived or exhausted, however, we are entitled to presume he stands fairly and finally convicted, especially when, as here, he already has had a fair opportunity to present his federal claims in a federal forum. Our trial and appellate procedures are not so unreliable that we may not afford their completed operation any binding effect beyond the next in a series of endless postconviction collateral attacks. To the contrary, a final judgment commands respect. For this reason, we have long and consistently affirmed that a collateral challenge may not do service for an appeal.

*Frady*, 456 U.S. at 164-65; *accord Elzy v. United States*, 205 F.3d 882, 884 (6th Cir. 2000) (stating that "respect for the finality of judgments demands that collateral attack generally not be allowed to do service for an appeal"). Where a defendant fails to assert claims on direct appeal and attempts

to raise them in a § 2255 motion, "he also must show either that (1) he had good cause for his failure to raise such arguments and he would suffer prejudice if unable to proceed, or (2) he is actually innocent." *Regalado*, 334 F.3d at 528.

McKinney has shown neither. He states in his motion that he received criminal history points for stale misdemeanor convictions. However, he has not specified the convictions he challenges, or how the timing of those convictions and ensuing sentences disqualified them from being counted. The "cause" he cites is his lawyer's failure to raise the issue at sentencing. But as noted earlier, an attorney has no obligation to raise an argument that lacks merit. It is not sufficient to raise a theoretical argument without explaining how the legal principles apply to the specific facts of the case. And that is all McKinney has done here.

V.

McKinney has not shown that he is entitled to relief from his convictions or his sentences.

Accordingly, it is **ORDERED** that the petitioner's motion to vacate his sentence [dkt. #138] is **DENIED**.

It is further **ORDERED** that the petitioner's motion to reduce his sentence [dkt. #131] and his motion to correct his sentence [dkt. #157] are **DENIED**.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Dated: February 14, 2018

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 14, 2018.

          s/Susan K. Pinkowski
          SUSAN K. PINKOWSKI